*IOWA NATIONAL BANK, Appellant, v. J. M. STEWART et al., Appellees.

CENTRAL STATE BANK, Appellant, v. J. M. STEWART et al., Appellees.

Nos. 39843, 39844.

* This cause reversed. See 284 U. S. 239 (52 Sup. Ct. Rep. 133, 76 L. Ed. 265).

1230

SEPTEMBER 26, 1930.

Sargent, Gamble & Read, for appellants.

Ben. J. Gibson and Sargent, Gamble & Read, for Central Trust Company of Des Moines and L. A. Andrew, State Superintendent of Banking, Receiver, appellants.

Wilson & Shaw, John Fletcher, Attorney-general, Maxwell A. O'Brien, Assistant Attorney-general, Eskil C. Carlson, Charles Hutchinson, and Carl Missildine, for appellees.

MORLING, C. J.—For the years 1919 to 1922, inclusive, the plaintiffs (two national banks and five state banks and trust companies doing business in Des Moines) made their sworn statements to the assessor for the assessment of the shares of their stock to their individual stockholders (omitting, however, the names of the stockholders and numbers of shares of their several holdings, as to which, and as to deductions on account of amount invested in real estate, no question is raised), all as provided by Section 1322 et seq., Code Supp. 1913.

The assessor classified the plaintiffs' taxable property as corporate stock and made up the assessment rolls accordingly, assessing the stockholders (though not individually) on each share of stock. The returned value of such shares was computed on the basis of the sworn statements. This classification and assessment was passed by the board of review. The assessor's books were made up and returned to the county auditor in conformity with the sworn statements and assessment rolls.

These assessments were made and appeared upon the rolls and upon the assessor's books as assessments upon "corporate stock." The county auditor so entered them upon the tax books, fixing the taxable value at 20 per cent of the actual value, and applied to such taxable value the consolidated levy for the respective years which varied from 137.8 to 164 mills. .

During these years a large number of domestic corporations employing, as we shall assume, moneyed capital in competition with plaintiffs in Des Moines in like form made to the assessor their sworn statements. The assessor in these cases used the same classification and assessment, applied to the capital of these corporations the same basis of assessment, and made up and returned to the county auditor the assessment rolls and the assessor's books in identically the same form and on the same basis as in the case of the assessments against the plaintiffs.

The county auditor in some of these assessments against competing corporations fixed the taxable value at 20 per cent of the actual value and applied the consolidated levy as in the case of the plaintiffs. After the tax books had passed into the hands of the treasurer, but before payment, the county auditor changed these assessments as they appeared upon the tax books to assessments of moneys and credits and applied to them the five-mill levy. As to the rest of the assessments of the competing domestic corporations the county auditor, instead of entering on the tax books the assessments as taxes upon "corporate stock" and applying the consolidated levy upon 20 per cent of the valuation, extended them on the tax books as "moneys and credits," and applied the five-mill levy on the dollar of actual valuation, under Sections 1310 and 1311, Code Supplement, 1913.

During these years there were in the city of Des Moines a large number of persons and a few foreign corporations, who, as we shall assume, were employing moneyed capital in competition with plaintiffs. The assessor classified and assessed this competing capital as "moneys and credits." He made up the assessment rolls and assessor's books accordingly and returned them to the county auditor. The county auditor extended these assessments upon the tax books as "moneys and credits," and applied to them the five-mill levy upon the actual net valuation.

The consolidated levy applied to the 20 per cent of the valuation of the stock in plaintiff corporations resulted in a much larger tax than would have the five-mill levy applied to the full valuation.

Plaintiffs knew just what was occurring with respect to their assessments. The sworn statements of the plaintiffs to the assessor show that they are "to aid the assessor in fixing the value of shares of stock in national, state or saving banks or loan and trust companies, to be assessed to the individual stockholders, each such bank or trust company is required to furnish him a verified statement of all the matters set forth below * * * Statement of Assets, Liabilities, etc. On the first day of January * * * of the (e.g., Iowa National Bank) exclusive of real estate which is to be listed and assessed in each odd numbered year only, as other real estate, as follows * * *" Following are assets and liabilities tabulated, the total of capital, surplus and undivided earnings set out, the value of the real estate deducted, with the result "value of stock,

less real estate,'' (e.g., Iowa National Bank $1,814,347.49.) The printed instructions on the sworn statement forms direct the assessor to send the president or cashier one of the blanks, and state: ''This data is to aid you in fixing the value of the stock of said corporation which is to be assessed to the stockholders * * * and the corporation is made liable for the payment of the tax thereon.'' The assessment rolls of the individual taxpayers in question show on their face that they were assessments ''of moneys and credits taxed at 5 mills or $5.00 for each one thousand dollars thereof.'' The dates of all of the assessment rolls of competing capital do not appear, but at least part of them were made during January and February. The assessments against the plaintiffs were made during the month of January. The board of review met on the first Monday in April. The dates of final adjournment varied from April twentieth to May sixth.

Plaintiffs severally in each of the years in controversy made complaint to the board of review in which they objected to their respective assessments on the ground that the assessments included the value of tax-exempt government securities, the amount of which should, as plaintiffs there claimed, have been deducted from their assessments. In presenting this claim the plaintiffs in their respective objections, among other things, appealed to Section 5219, U. S. Revised Statutes, to Sections 1321, 1322, Code Supp., 1913, to Chapter 257, Laws 38th G. A., and Section 2, Article 8, of the State Constitution, all of which were, in the objections, alleged to have been violated. The board of review overruled the objections. Plaintiffs severally appealed to the district court. Similar appeals and similar objections were made and overruled and appeals taken in each of the years in controversy.

That plaintiffs, at the time of making their objections before the board of review, were chargeable with notice of the facts on which they now base their complaint of discrimination (except, of course, that at the time of making the objections for any one year they did not know of the fact of the change by the auditor on the books for that year, because that change would be made after the filing of the objections), is not denied, but is the necessary conclusion from the record before us, some of which will be referred to.

The record shows the existence of considerable intimacy between plaintiffs and the taxpayers whose assessments are brought

to our attention. The vice president and trust officer of plaintiff Central Trust Company made the returns of some of the individual taxpayers here alleged to be in competition with plaintiffs. The president of the plaintiff Central State Bank testifies that that bank waited until 1923 to pay their taxes because they thought they would be exempted.

"Q. When did you think you would be exempted? A. I think it was brought to our attention in 1919 that we would not have to pay these taxes. * * * Q. In 1919 you knew or were conscious of the fact that you had objections to these taxes which were eventually paid by the Central State Bank; is that correct? * * * A. Yes, we thought we should be excused from paying the taxes. Q. And those were the same objections that you now make to these taxes; is that right? * * * A. Yes. Q. And you had those same objections in 1920, 1921, and 1922? * * * Yes." (The objection, "immaterial and irrelevant", is not well taken.)

The vice president of plaintiff Valley National Bank and cashier of plaintiff Valley Savings Bank testifies:

"I have discussed the matter with Mr. Crawford [president of the Valley National Bank and vice president of the Valley Savings Bank] as to whether the stock of the bank ought not to be taxed as moneys and credits at five mills on the dollar. I could not state when that discussion was first had—it has been a matter of several years. I would say that Mr. Crawford had it in mind some years back; at least the question of whether the bank stock ought not to be taxed as moneys and credits. * * * I had in mind on March 17, 1920, that we might wish to contest this assessment. I have no positive recollection as to the grounds of such contest, but I presume on the same grounds we are contesting it now. * * * I unquestionably discussed many times the question as to whether the banks were being discriminated against when other people were only being taxed five mills on the dollar, but I could not say just when, possibly 1921."

The vice president of plaintiffs Des Moines Savings and Iowa National Bank testifies:

"During the four years we set up a reserve to cover the taxes if it developed we would have to pay them. * * * The question

as to the law and liability of the banks was frequently discussed among the officers. I think as far back as January 1, 1919, there was some discussion among the officers of the bank that there were other people engaged in business which we considered competitive with the bank that were not being taxed at as high a rate as we were. * * * I think in 1921 and 1922 there was still considerable discussion as to the liability of the bank for payment of taxes and resisting of payment."

In the petition of the Iowa National Bank on appeal from the assessment for 1920 is the allegation:

"That on said January 1, 1920, there were within the limits of the city of Des Moines persons other than corporations and part of whose business is the receiving of deposits subject to check or certificates, receipts or otherwise, or the selling of exchange, or in other words there were within the limits of the city of Des Moines persons engaged in business as private bankers, within the meaning of Section 1321 of the Supplement to the Code of Iowa; that plaintiff is informed and believes, and upon such information avers, that the Drake Park Bank, the Cottage Grove Bank, the Oak Park Bank and the Capitol Hill Bank were each conducted by persons other than corporations and as private bankers within the meaning of said section."

The evidence shows that these institutions were assessed on the basis of moneys and credits at the five-mill rate.

The competing capital in question falls into two classes: 1. Competing capital, the assessment of which, as made by the assessor, reported by him to the board of review, approved by that board, entered upon the tax books, and so returned to the county auditor, was on the alleged discriminatory basis now complained of. This capital is that in the hands of individuals and foreign corporations. 2. Competing capital the assessments of which, as made by the assessor and as approved by the board of review, entered upon the assessor's books and returned to the county auditor, were by the same mode and at the same rate as those against the plaintiffs, but in respect to which the alleged discrimination resulted from subsequent acts of the county auditor in attempting to change them. This capital was in the hands of domestic corporations.

I. As to the first class of competing capital the plain-

tiffs had an available remedy by appeal to the board of review and further appeal from the board of review to the district court, a remedy to which they resorted, though they did not therein ask for correction on account of the alleged discrimination of which they now complain.

In the appeals so taken in 1919 to the district court the defendants therein demurred to the petitions. The demurrers were overruled August 1, 1919. The defendants in the appeals elected to stand on their demurrers, and judgments were entered for plaintiffs (who are plaintiffs here). Those defendants then appealed to this court. Stipulations that the appeals should abide the final judgment in the then pending case of the Des Moines National Bank against Fairweather were made. Like objections, appeals and proceedings were taken in each of the years 1920, 1921 and 1922. The judgment in Des Moines National Bank v. Fairweather was reversed in this court. 191 Iowa 1240. On writ of error to the Supreme Court of the United States the judgment of this Court was affirmed. Des Moines National Bank v. Fairweather, 263 U. S. 103, 68 L. Ed. 191. Thereupon in each of the cases of these plaintiffs there was entered: ''This case is hereby dismissed by plaintiff * * * in accordance with stipulation.''

By Section 1373, Code Supp. 1913, ''any person aggrieved by the action of the assessor in assessing his property may make oral or written complaint thereof to the board of review, which shall consist simply of a statement of the errors complained of, with such facts as may lead to their correction, * * * and appeals may be taken from the action of the board with reference to such complaints to the district court * * * within 20 days after its [board of review's] adjournment. * * * The court shall hear the appeal in equity and determine anew all questions arising before the board which relate to the liability of the property to assessment or the amount thereof * * *'' As to competing capital of individuals and foreign corporations, this remedy was available to the plaintiffs to correct the alleged errors of which they now complain. Griswold L. & C. Co. v. Calhoun County, 198 Iowa 1240; First National Bank v. Board of Review, 199 Iowa 1124; First National Bank v. Board of Review, 200 Iowa 131.

It is essential to the proper functioning of the state and of its subdivisions that matters of taxation be adjusted and settled

at as early date as possible and through administrative boards. The board of review may make the assessment. Barhydt v. Cross, 156 Iowa 271. Plaintiffs were required in their complaint to the board of review to make all objections to the proposed assessment which they then had, though the objections might be made very informally. However informally made, if called to the attention of the board of review, objections would be reviewed on appeal in the district court and would be there triable de novo. Wahkonsa Investment Co. v. Ft. Dodge, 125 Iowa 148.

"It is the duty of the district court to make a just and equitable assessment." Lyons v. Board of Review, 102 Iowa 1.

"Upon the appeal the circuit (district) court * * * that court is required to hear the matter anew upon all evidence tending to direct to a just decision." Grimes v. Burlington, 74 Iowa 123, 126.

See, also, Lyons v. Board of Equalization, 102 Iowa 1; Des Moines Gas Company v. Saverude, 190 Iowa 165. The district court tries the appeal de novo in chancery, and on appeal to this court the case is triable de novo. Grimes v. Burlington, 74 Iowa 123, 126.

As to the alleged discrimination in favor of moneyed capital held by individual taxpayers and foreign corporations, the remedy afforded before the board of review and by appeal was available, adequate and exclusive. Collins v. Keokuk, 118 Iowa 30; Crawford v. Polk County, 112 Iowa 118; First National Bank v. Burke, 201 Iowa 994; Dickey v. Polk County, 58 Iowa 287; Keokuk Bridge Co. v. Salm, 258 U. S. 122, 66 L. Ed. 496; First National Bank v. Board of County Comrs. 264 U. S. 450, 68 L. Ed. 784; Burrill v. Locomobile Co., 258 U. S. 34, 66 L. Ed. 450. Munn v. Des Moines Nat. Bank, 18 Fed. (2d) 269, cited at this point, will be referred to later.

Whether or not plaintiffs, though they did not in their appeals present the objections now made, are estopped by the judgments, we need not pause to discuss. See, however, Lyman v. Faris, 53 Iowa 498; Turner v. Sandhouse, 205 Iowa 1151; Reining v. Nevison, 203 Iowa 995; Benedict v. Nielson, 204 Iowa 1373; Fidelity National Bank & Trust Co. v. Swope, 274 U. S. 123, 71 L. Ed. 959; 34 C. J. 779, 784, 787, 890; 34 C. J. 818, 910, 966; Bowen v. Duffie, 66 Iowa 88; Woodbury County v. Talley, County Treasurer, 147 Iowa 498; In re Assessment Stock Yards

1238

Co., 149 Iowa 5; Skinner v. Township Board (Mich.), 213 N. W. 680, 681.

██ II. As to taxes assessed upon competing capital held by domestic corporations. Plaintiffs are of two classes. 1. State Banks. 2. National Banks. The state banks are organized under and owe their existence to the statutes of the state of Iowa. They are concluded by state legislation within constitutional limits. National banks are agencies of the United States, and they or their shares are subject to taxation only to the extent permitted by federal legislation. Both classes of plaintiffs allege unconstitutional discrimination against them because of the acts of the county auditor in changing the assessments upon competing capital held by domestic corporations from "corporate stock" to "moneys and credits" and applying the five-mill levy instead of the consolidated levy of 20 per cent of the valuation applied to plaintiffs. Plaintiffs' contention is that by these means they were denied the equal protection of the laws in violation of the Fourteenth Amendment and of the corresponding guaranty (Section 6, Article 1) of the State Constitution.

"The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." Sunday Lake Iron Co. v. Wakefield, 247 U. S. 350, 62 L. Ed. 1154.

See, also, Sioux City Bridge Co. v. Dakota County, 260 U. S. 441, 67 L. Ed. 340, 342.

Plaintiffs do not attack the statutes of the state. Their assault is exclusively upon the administration of the statutes, which they claim, for the years mentioned, was systematically, habitually and intentionally discriminatory, to their injury. Section 5219, Rev. St. U. S., prior to the amendment, with which we are not here concerned, permitted state taxation, subject to the restriction "that the taxation shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state." The state statutes prescribing the mode and rate of taxation applicable to plaintiffs and their competitors may be found in Sections 1310, 1311, 1321, 1322, 1322-1a of the Code Supplement, 1913. The alleged unconstitutional discrim-

ination and the alleged violation of the restriction of Section 5219 with respect to taxes assessed upon competing capital held by domestic corporations are not in the proceedings by the assessor or the board of review or in the assessment as made and returned by them, but in the subsequent acts of the county auditor in extending the assessments upon the tax books and (the inferentially alleged) resulting failure of the county treasurer when the tax books came into his hands to collect the taxes as assessed by the assessor and confirmed by the board of review. Discrimination in the administration of a concededly valid law can be practiced only in the imposition of the tax or in its collection. If the tax as legally imposed is valid, there can be no discrimination in the imposition. If the tax legally imposed is non-discriminatory, it does not become discriminatory in the imposition by subsequent illegal and void acts of a merely ministerial or clerical officer or employee in attempting to make changes. If the alleged discrimination is in the collection, it must be in collecting from some and not collecting from others. Clearly, in such case the non-collection must be such as to be chargeable to the state. The non-collection of lawfully assessed and nondiscriminatory taxes upon other property must be due to bad faith, intentional and willful on the part of those who therein as its duly constituted officers represent the state.

Taxation for the purpose of this case consists of three processes: First, the levy; second, the assessment; third, the collection. It is contended that of the two levies involved (each of itself, if properly applied, concededly valid), the lesser one was applied to the competing capital of the domestic corporations, while the larger one was applied to the plaintiffs.

It is contended that the assessments were discriminatory although plaintiffs themselves correctly argue:

"The action of the county auditor and his deputy in placing the assessments on the shares of corporations upon the tax list as 'moneys and credits' was an unlawful change of classification and beyond the power of the auditor. Fort Madison v. Maxwell, et al., 202 Iowa 1346."

The assessment is made in the first instance by the local assessor, who lists and classifies the property and makes valuations. He then lays the assessment rolls before the local board of review. The local board of review adjusts the assessments "in

such manner as to secure the listing of property at its actual value and the assessment of property at its taxable value," and adds "to the assessment rolls any taxable property not included therein * * * as the assessor should have done." Code Supp. 1913, Section 1370. When the corrections have been made, the assessor makes up the assessor's book and returns it to the county auditor together with the assessment rolls. Id. Section 1366. The county board of review equalizes class valuations between political subdivisions of the county and the state board of review equalizes between the counties. Id. Code 1897, Sections 1375, 1379. The classification and assessment by the assessor, as approved by the board of review, determine the levy or rate to be applied.

The assessment consists in the listing of the property to be taxed and the estimation of the sums which are to constitute the basis of the apportionment of the tax,—that is, the valuation. Appeal of Seaman, 135 Iowa 543; 3 Cooley Taxation, 4th Ed., Sec. 1044.

The assessments and the rate to be paid by the several taxpayers as between themselves are complete and are determined when the assessor returns the assessment rolls and assessment book to the county auditor, subject to class modification by the county and state boards of review and to change by the court if appeal has been taken. The remainder of the process of taxation is one of collection and enforcement of the taxes as so assessed. This is ministerial. The auditor's duty is to transcribe the assessments into the tax book and make the necessary computations and extensions and clerical corrections. This duty is merely clerical and ministerial. First National Bank v. Burke, 201 Iowa 994; First National Bank v. Hayes, 186 Iowa 892; Ridley v. Doughty, 77 Iowa 226, 85 Iowa 418; Milwaukee & St. Paul Railroad Co. v. Kossuth County, 41 Iowa 57, 66; 3 Cooley Taxation, 4th Ed., Section 1167; People v. Pittsburgh, 147 N. E. 492, 316 Ill. 410. The auditor's act in changing the classification and assessment of the property of the competing corporations was without power and void. Fort Madison Sec. Co. v. Maxwell, 202 Iowa 1346. The county treasurer was not bound by it. Dickey v. Polk County, 58 Iowa 287. Whether he could justify under it we need not inquire.

The process of assessment and the determination of the

levy or rate to be applied were complete and final when the assessment books recording the assessments and showing applicable levy as approved by the board of review were returned to the county auditor. The county auditor had no authority or discretion whatever to make or to change the assessment or levy or to determine the applicability of one or the other levy. His duties, merely clerical, were to transcribe to the tax books the assessments as returned by the assessor, to apply to them the designated levy (in this case the consolidated levy upon 20 per cent of the valuation), and to compute and extend the tax accordingly. He had no authority whatever to reduce the rate of taxation as determined by the assessor and the board of review. The auditor's acts in making the purported changes were a mere nullity. When the assessment books were returned to the county auditor, it was the right of the state to collect the taxes as shown by those books (subject to the result of appeals and action taken by the boards of equalization, if any). Neither the county auditor nor the county treasurer had authority to waive or discharge legally assessed taxes except on payment to the treasurer. The taxpayers could not absolve themselves from liability for the payment of those legally imposed taxes by setting up the illegal act of the auditor.

If they have not paid, the tax, to the extent not paid, has not been discharged. The power of the state to compel payment does not end until payment is made. Weyerhaueser v. Minnesota, 176 U. S. 550 (44 L. Ed. 583, 71 N. W. 265, 75 N. W. 718); County of Redwood v. Winona Land Co., 40 Minn. 512 (41 N. W. 465, 42 N. W. 473); White River Lbr. Co. v. Arkansas, 279 U. S. 692 (73 L. Ed. 903, 2 S. W. [2d] 25); Anderson v. Ritterbusch 22 Okla. 761 (98 Pac. 1002).

Plaintiffs are the acting parties. It is incumbent upon them to plead and prove all the essential elements of their cause of action. The plaintiffs make no allegation and have introduced no evidence that the right of the state to the taxes so lawfully assessed has been in any wise defeated or barred. It is only by inference, or from the mutual assumption of the parties (if at all), that we can say that the domestic corporations have paid taxes only in accordance with the change illegally made by the auditor, or that no proceedings have been taken to enforce payment of the taxes legally assessed. The present suits were commenced within three years of the date when the last of the taxes

in question would be delinquent. It does not appear that the illegal acts of the auditor were ever called to the attention of the board of supervisors, the executive council, the department of justice, the legislature, or of any of the authorities of the state who had any power of supervision or duty to enforce correction of the misfeasances of the county auditor or county treasurer. The county auditor undoubtedly intended, as he testifies, to change from the higher to the lower levy upon the competing capital. His reason is, "under proper showing they were assessed wrong." But he was merely usurping authority. We are referred to no principle or authority upon which it may be held that the state or its subdivisions had not, at the time of the commencement of this suit, or have not now, the right and power to enforce payment of the taxes rightfully assessed against the competing corporations. We find no evidence or ground for inference that the state, or its duly constituted officers, do not intend to collect from the competing corporations the taxes which the statutes require them to pay and which have been levied and assessed against them. On this record it must be held that there was no discrimination in the levy or assessment as between plaintiffs and the competing corporations, and it cannot be held that the state has knowingly or willfully discriminated in the collection of the taxes.

"It is to be presumed that if trust or other companies are exercising powers not conferred by law the state will take the proper steps to keep them within their statutory limits, and a neglect for a limited time to do so cannot be considered as an assent by the state to such an improper assumption of power. It is not to be assumed that the state is acting in bad faith; that it has so legislated that upon the face of the statutes a uniform rate of taxation upon all moneyed capital is provided, while at the same time it has designedly placed the grants of some corporate franchises in such form as to permit the use of moneyed capital in certain ways with peculiar and less stringent rates of taxation. Certainly there is nothing in the case to indicate any want of good faith on the part of the state of New York." Jenkins v. Neff, 186 U. S. 230, 235 (46 L. Ed. 1140, 1143).

"And it must be regarded as settled that intentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed

upon, the full value of his property. \* \* \* It is also clear that mere errors of judgment by officials will not support a claim of discrimination. There must be something more, — something which in effect amounts to an intentional violation of the essential principle of practical uniformity. The good faith of such officers and the validity of their actions are presumed; when assailed, the burden of proof is upon the complaining party." Sunday Lake Iron Co. v. Wakefield, 247 U. S. 350 (62 L. Ed. 1154).

In White River Lbr. Co. v. Arkansas, 279 U. S. 692 (73 L. Ed. 903, 910), quoting from Winona & St. Paul Land Co. v. Minnesota (U. S.), 40 L. Ed. 247, it is said:

" 'If the state, as has been seen, has the power, in the first instance, to classify property for taxation, it has the same right of classification as to property which in past years has escaped taxation. \* \* \* If taxes are to be regarded as mere debts, then the effort of the state to collect from one debtor is not prejudiced by its failure to make like effort to collect from another. And if regarded in the truer light as a contribution to the support of the government, then it does not lie in the mouth of one called upon to make his contribution to complain that some other person has not been coerced into a like contribution.' "

See, also, Florida Cent. & P. R. Co. v. Reynolds, 183 U. S. 471 (46 L. Ed. 283, 287, 288).

The changes made by the auditor would, if carried into effect, operate as a fraud upon the state. They would also operate as a fraud upon the other taxpayers by reason of their tendency to reduce the legitimate income of the state, and consequently increase the burden of the other taxpayers. For this they had a remedy. VanWagenen v. Supervisors, 74 Iowa 716; Collins v. Davis, 57 Iowa 256. See, also, Ridley v. Doughty, 85 Iowa 418; First Nat. Bank v. Burke, 201 Iowa 994; Avoca State Bank v. Burke, 193 Iowa 1055; 38 Corpus Juris 846, 575. Plaintiffs now however in effect ask, not that this wrong be righted, but that the auditor's illegal action be confirmed and perpetuated and its benefits extended to them; that the injury to the state and taxpayers generally be expanded by extending to them the benefits as of a similar wrong.

"The 'equal protection of the law' cannot mean equal im-

munity in its violation or evasion." State v. Hall (Ala.), 54 So. 560.

Whether under the facts of the case the plaintiffs have a standing to invoke the extraordinary remedy of mandamus, the granting of which is largely controlled by equitable principles, we do not stop to determine. See Duncan Townsite Co. v. Lane, 245 U. S. 308, 311 (62 L. Ed. 309, 311) ; Ex parte Skinner, 265 U. S. 86 (68 L. Ed. 912).

What is said in Montana Nat. Bank v. Yellowstone County, 276 U. S. 499 (72 L. Ed. 673), is not in point, for the reason that the taxing officers in that case had acted in accordance with the construction placed on the tax laws by the Supreme Court of the state—a construction which was afterwards changed. The county officers in the taxation there in question had acted under the authority of the state, and had executed the law as authoritatively declared by the highest judicial tribunal of the state. The court's construction of the law was afterwards changed, but at the time of the acts in question was binding upon the taxing officers. Whether after the change those officers might, or probably would, proceed to correct the discrimination which was valid when made was purely speculative. Here, not the taxing officers, but a local clerical official perpetrated an act illegal and a nullity from the beginning—an act which was wholly without authority, an act as to which no semblance of confirmation or waiver is shown. In order to constitute discrimination in the practical administration of the law it must appear that the discriminatory administration was authoritative and intentional. The intention must be that of the state, through officials to whom administration is entrusted, and whose intention may be charged to the state. We hold on this record that the taxation against competing domestic corporations is at the same rate as that against plaintiffs, and that, giving the plaintiffs the benefit of all inference and assumptions that may legitimately arise upon this record, there has been, at most, merely delay in not collecting the full amount of taxes owing by domestic corporations.

The main purpose of Congress in the enactment of Section 5219 is to render it impossible for the state, in levying taxes upon national banks or upon their shares, "to create and foster an unequal and unfriendly competition, by favoring institutions or individuals carrying on a similar business and operations and in-

vestments of a like character." New York ex rel. Amoskeag Sav. Bank v. Purdy, 231 U. S. 373 (58 L. Ed. 274, 281).

See, also, Des Moines Nat. Bank v. Fairweather, 263 U. S. 103, 116 (68 L. Ed. 191, 199) ; First Nat. Bank v. Anderson, 269 U. S. 341 (70 L. Ed. 295). While the lawfully imposed assessments against the competing corporations stand, as having been made by the same method and at the same rate as those against the plaintiffs, and the right to collect then does not appear to be barred, and it is not shown that the state or its duly constituted officers do not intend to collect such taxes, it cannot be said that plaintiffs have suffered from unequal competition because the state has collected from the national banks a larger tax in proportion than it has yet collected from the competing corporations. This record falls far short of showing that unequal or unfriendly competition has been in any wise created, fostered, or encouraged by the state or those charged with the administration and enforcement of the law. Certainly the state and all of its authorized officials have acted in the utmost good faith and in accordance with the constitutional and statutory rights of the plaintiffs.

III. Plaintiffs argue that "the identical causes of action were involved and determined in the cause of Munn v. Des Moines Nat. Bank (18 Fed. [2d] 269). Under such circumstances the holdings of the Federal courts are obligatory upon the state courts."

Munn v. Des Moines Nat. Bank, 18 Fed (2d) 269, was brought to enjoin the county treasurer from collecting taxes from the shareholders of the plaintiffs on their stock "in excess of the taxes that would have been levied on account of those shares in the years 1919, 1920, 1921, and 1922, if the taxes on the actual value of those shares had been levied on the same basis that taxes were levied on the actual value of other moneyed capital in the hands of individuals used in competition with the normal moneyed capital of these banks."

Those suits were brought in behalf of banks other than the present plaintiffs. The present suits are not based upon the judgment in that suit, and could not be.

In the later case in the same court of Nelson v. First Nat. Bank, 42 Fed. (2d) 30, it is said that the *Munn* case "was expressly based on 'the peculiar facts of these cases.' * * * Unless we can say broadly that the above difficulties, pointed out in the *Munn* case, are inherent in this statutory system of review under

**1246**

all circumstances, that case is not controlling. We think this would be an unwarrantable extension of that decision and that appellees must exhaust this administrative remedy of appeal to the board of review before they can come into court.''

The Federal Circuit Courts of Appeals and, in respect to Federal law, the state courts of last resort are subject to the supervisory jurisdiction of the Supreme Court of the United States. They are, however, as to the laws of the United States co-ordinate courts. Finality of determination in respect to the laws of the United States rests in the Supreme Court of the United States. Until the Supreme Court of the United States has spoken, state courts are not precluded from exercising their own judgment upon questions of Federal law. They are not concluded by, though they should give respectful consideration to, the decisions of the Federal Circuit Courts of Appeal and district courts. Wells v. Western Union Tel. Co., 144 Iowa 605, 611; State v. Taylor, 298 Mo. 474 (251 S. W. 383); Walters v. Commonwealth, 199 Ky. 182 (250 S. W. 839).

IV. It is contended that the action of the taxing officials in exacting statutory interest and penalties from four of the plaintiffs was illegal because of the pendency of good-faith appeal. The appeals referred to adopt the appeal considered in Des Moines Nat. Bank v. Fairweather, 191 Iowa 1240, result in which by stipulation was to control. Plaintiffs' present contention is that they were taxed too much in comparison with the taxes of others. They failed to sustain the contention made in the Fairweather case or their contentions made here. They have shown no legal excuse for not paying the tax. They are, therefore, liable for the penalty. Lamont Sav. Bank v. Luther, 200 Iowa 180. See cases cited 37 Cyc. 1544.

Rystad v. Drainage Dist., 170 Iowa 178, involved the right to penalties on drainage assessment pending an appeal which was triable de novo. It was held that such appeal was part of the statutory method of determining the amount which should be levied, and during the pendency of such an appeal the assessment was in abeyance, not delinquent, and therefore not subject to penalties. See, also, Barber Asph. Pav. Co. v. District Court, 181 Iowa 1265. Those cases are not in point. After the determination of the appeals in the district court the landowners tendered full payment of the amount as established by the district court,

though without interest. The taxes were payable in installments, and were held not to be delinquent at the time from which the penalties were assessed. The taxes here in controversy are for the current expenses which the state and municipalities must defray in due course after the taxes become due. Taxpayers ought not to be encouraged in the non-payment of taxes by saving them the penalties pending unsuccessful litigation on the plea that the litigation was prosecuted in good faith. One of the purposes of penalties is to discourage evasion and procrastination.—Affirmed.

EVANS, STEVENS, FAVILLE, and DE GRAFF, JJ., concur.

WAGNER, J.—Dissenting. The minority of the court cannot concur in the reasoning of the majority, nor in the result reached. Since we would reverse, it will be necessary, in this dissenting opinion, to consider the various propositions urged in argument by the respective parties, which we will now proceed to do.

It was stipulated in the trial court that the above-entitled causes should not be consolidated, but that the testimony should be taken at one time, and in so far as applicable, the same should apply to all of said causes. It will be observed at the outset that the plaintiffs include two national banks, and that the remaining five are institutions incorporated under the laws of this state. The respective causes are presented to this court by the same abstract of the record, and the briefs and arguments of the respective parties are made applicable to all of said causes. The taxes involved are for the years 1919 to 1922 inclusive.

It is alleged in the petitions of the national bank cases, in substance, that in each of the years 1919 to 1922, inclusive, the city assessor of the city of Des Moines made assessments upon their shares of stock, which were entered upon the assessment rolls in a lump sum, under the sub-head "Corporation Stock"; that such assessments were laid before the Board of Review in each year and by said Board sustained; that the assessments were transmitted to the County Auditor, and each year the consolidated levy rate of taxation for state, county, city and school purposes was applied to 20% of the total assessed value of the shares of stock.

It is further alleged in said petitions, in substance, that during each of the four years there were a large number of corporations engaged in the business of loaning money in competition

with banking capital in the loan market in the city of Des Moines, and that the shares of such corporations constituted "moneyed capital," within the meaning of Section 5219 of the Revised Statutes of the United States; that in each of said years, the assessments upon the shares of stock of such corporations were made by the city assessor and entered upon the assessment rolls under the sub-head "Corporation Stock," in the identical manner that the assessments were made upon the shares of the plaintiffs; that the amount of the assessed value of the shares of such corporations aggregated millions of dollars; that the assessments upon the shares of such corporations, long after the Board of Review had met and adjourned in each of said years, were systematically, habitually and intentionally placed upon the tax list of Polk County as "moneys and credits," and systematically, habitually and intentionally taxed at but 5 mills on the dollar.

It is further alleged in said petitions, in substance, that in each of these said four years, the taxing officers of Polk County did generally, systematically and intentionally include in the total assessment of moneys and credits, assessments against individuals who held notes, mortgages, bonds and other evidences of indebtedness of such nature that they came into competition with banking capital, and the holdings of said individuals were uniformly, intentionally and generally subjected to a tax of but 5 mills on the dollar; that assessments of individuals of such character, in each of said years, aggregated millions of dollars.

It is further alleged in the petitions, in substance, that the consolidated levy rate of taxation for the year 1919 was 137.8 mills, for 1920, 157 mills, for 1921, 164 mills, and for 1922, 160.4 mills; that the shares of stock of the plaintiff banks could not lawfully be subjected to a greater rate of tax than was imposed upon the assessments of such other corporations and individuals; that by reason of the discrimination in the administration of the tax laws by the officers of Polk County, the shares of the plaintiff banks were taxed at a greater rate than imposed upon moneyed capital in the hands of individual citizens, and that the action of the taxing officers constituted a violation of Section 5219 of the Revised Statutes of the United States; that the systematic and intentional misadministration of the tax law by the taxing officers of Polk County constituted a denial to the plaintiffs of rights guaranteed by the Constitutions of both the United States and the state of Iowa.

The Iowa National Bank further alleges in its petition, in substance, that in the years 1919, 1920 and 1921, it appeared before the Board of Review and objected to the amount of its assessment, because it was the owner of Liberty Bonds, United States Certificates of Indebtedness, and Federal Reserve Bank Stock, and that, under Chapter 257 of the Acts of the 38th General Assembly, it was entitled to deduct from the assessed value of its shares the amount of such United States securities; that in each year appeals were prosecuted from the Board of Review to the District Court of Polk County, and in the year 1919 a judgment was rendered in favor of the bank, cancelling the assessment upon its shares; that an appeal was prosecuted to the Supreme Court of Iowa in a similar cause, known as Des Moines National Bank v. Fairweather, and by stipulation, it was agreed that the Iowa National Bank case should abide the result of the appeal to the Iowa Supreme Court, or the United States Supreme Court; that the Fairweather case was not determined until November 12, 1923, when the Supreme Court of the United States handed down its opinion denying the right of the bank to make deductions on account of United States securities.

It is further alleged in the petition of the Iowa National Bank, in substance, that on November 28, 1923, the plaintiff tendered to the County Treasurer 5 mills on the dollar upon the assessed valuation of its shares for the years 1919, 1920, 1921, and 1922, together with interest upon such taxes at 6%, from the time the same would have become due, but for the appeals, to the date of the tender; that the County Treasurer refused the tender and demanded that plaintiff pay the tax upon its shares at the consolidated levy rate, together with accrued interest and penalties at the statutory rate; that said bank, under written protest, then paid the full amount of the taxes, computed according to the consolidated rate, and all penalties demanded by the treasurer, although the taxes were not delinquent; that it thereafter presented its claim for a refund of taxes to the Board of Supervisors.

The petition of the Valley National Bank omitted all the allegations with respect to the tender and payment of taxes in November, 1923, and alleges the dates of the payment of the taxes for the years in question, and that they were paid under protest.

The petitions in the state bank cases, for all practical purposes, are identical with those in the national bank cases. The alleged defenses will be noted and considered as we proceed.

Since the matters in litigation arose prior to 1924, our citations of the statutory law will refer to the 1897 Code and Supplement thereto. Section 1310 of the 1913 Supplement of said Code provides:

"Moneys, credits and corporation shares or stocks, except as otherwise provided, * * * notes, including those secured by mortgage * * * and corporation shares or stocks not otherwise taxed in kind, shall be assessed, and, excepting shares of stock of national, state and savings banks and loan and trust companies, and moneyed capital as hereinafter defined, shall be taxed upon the uniform basis throughout the state of five mills on the dollar of actual valuation, same to be assessed and collected where the owner resides. * * * All moneyed capital within the meaning of section fifty-two hundred nineteen of the revised statutes of the United States shall be listed and assessed against the owner thereof at his place of business, and if a corporation at its principal place of business, at the same rate as state, savings, national bank and loan and trust company stock is taxed, in the same taxing district, and at the actual value of the moneyed capital so invested."

Section 1322-1a of the 1913 Supplement to the Code provides:

"For the purpose of placing the taxation of bank and loan and trust company stock and moneyed capital as nearly as possible upon a taxable value relatively equal to the taxable value at which other property is now actually assessed throughout the state as compared with the actual value thereof, it is hereby provided that state, savings and national bank stock and loan and trust company stock and moneyed capital shall be assessed and taxed upon the taxable value of twenty per cent of the actual value thereof, determined as herein provided, which twenty per cent of the actual value shall be taken and considered as the taxable value and shall be taxed as other property in such taxing district."

Thus, according to this statute, the tax upon the shares of stock of a banking corporation and upon moneyed capital is found by applying the consolidated levy rate to 20% of the actual value thereof.

" 'National banks are not merely private moneyed institutions, but agencies of the United States created under its laws to promote its fiscal policies; and hence the banks, their property and their shares cannot be taxed under state authority except as Congress consents and then only in conformity with the restrictions attached to its consent.' " First National Bank of Hartford, Wisconsin, v. City of Hartford, (U. S.) 71 L. Ed. 767.

Also see First National Bank of Guthrie Center v. Anderson, (U. S.) 70 L. Ed. 295; Des Moines National Bank v. Fairweather, (U. S.) 68 L. Ed. 191.

We now turn to the Act of Congress which restrictively gives its consent to the taxation of national banks, to wit, Section 5219 of the Revised Statutes of the United States, which provides:

"Nothing herein shall prevent all the shares in any association from being included in the valuation of the personal property of the owner or holder of such shares, in assessing taxes imposed by authority of the State within which the association is located; but the legislature of each state may determine and direct the manner and place of taxing all the shares of national banking associations located within the State, subject *only to the two restrictions, that the taxation shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state, and that the shares of any national banking association owned by nonresidents of any State shall be taxed in the city or town where the bank is located, and not elsewhere."* (Writer's Italics.)

It will be observed that Sections 1310 and 1322-1a of the 1913 Supplement to the 1897 Code comply with the two restrictions contained in Section 5219 of the Revised Statutes of the United States. Therefore, the statutory authority for the assessment of national banks is valid.

No question is raised by the appellants as to the validity of our statutory law. Their contention is that, by a systematic, habitual, intentional, and wrongful administration of the law by the taxing officers, an illegal discrimination has been worked against them, and that this is in violation of their rights. See Reagan v. Farmers Loan & Trust Company, (U. S.) 38 L. Ed. 1014; Sioux City Bridge Company v. Dakota County, (U. S.) 67

1252

L. Ed. 340; Greene v. Louisville Railway Company, (U. S.) 61 L. Ed. 1280; Cummings v. Merchants National Bank of Toledo, (U. S.) 25 L. Ed. 903; Raymond v. Chicago Union Traction Company, (U. S.) 52 L. Ed. 78; Sunday Lake Iron Company v. Township of Wakefield, (U. S.) 62 L. Ed. 1154; Taylor v. L. & N. R. Co., 88 Fed. 350; Munn v. Des Moines National Bank, 18 Fed. (2d) 269. In the Reagan case, supra, we find the following pronouncement:

*"A valid law may be wrongfully administered by officers of the state, and so as to make such administration an illegal burden and exaction upon the individual. A tax law, as it leaves the legislative hands, may not be obnoxious to any challenge, and yet the officers charged with the administration of that valid tax law may so act under it in the matter of assessment or collection as to work an illegal trespass upon the property rights of the individual."* (Writer's Italics.)

In Sioux City Bridge Company v. Dakota County, supra, the then Chief Justice Taft aptly declared:

" 'The purpose of the equal protection clause of the 14th amendment is to secure every person within the state's jurisdiction *against intentional and arbitrary discrimination,* whether occasioned by express terms of a statute *or by its improper execution through duly constituted agents.* And it must be regarded as settled that intentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property.' " (Writer's italics) (citing numerous cases.)

In Cummings v. Merchants National Bank of Toledo, supra, it is declared:

"Independently of this statute, however, we are of opinion that when a rule or system of valuation is adopted by those whose duty it is to make the assessment, which is designed to operate unequally and to violate a fundamental principle of the Constitution, and when this rule is applied not solely to one individual, but to a larger class of individuals or corporations, that equity may properly interfere to restrain the operation of this unconstitutional exercise of power."

In Raymond v. Chicago Union Traction Company, supra, we find the following pronouncement:

"A system of valuation was adopted and applied to a large class of corporations, differing wholly from that applied to other corporations of the same class, and resulting in a discrimination against the appellee of the most serious and material nature. It is not a question of mere difference of opinion as to the valuation of property, but it is a question of difference of method in the manner of assessing property of the same kind. Although the law itself may be valid and provide for a proper valuation, yet if, through mistake on the part of the state, through its board of equalization, and while acting as a quasi judicial body, the board erred in the method to be pursued in relation to the corporations now before us, the mistake is one which may be corrected in equity."

It is the contention of the appellants that numerous individuals in the city of Des Moines (from 150 to 200 in number), during the time in question, were engaged in the business of acquiring and selling notes, bonds, mortgages and securities; that said investments of said individuals were of a permanent character, or made temporarily with a view to sale or repayment and reinvestment; that said investments of said individuals amounted to millions of dollars; that said loans and investments were substantial in amount as compared with the capitalization of the banks in the city of Des Moines, and constituted substantial competition in the loan and investment features of banking, and that, therefore, the money of said individuals so loaned and invested, constituted moneyed capital, within the meaning of Section 5219 of the Revised Statutes of the United States; that the alleged moneyed capital was assessed to said individuals as moneys and credits, and that in this manner, an illegal discrimination has been worked in favor of said individuals and against the banks and their stockholders. As to this proposition, it is urged by the appellees that the remedy of the appellants was by making complaint to the Board of Review and taking an appeal from the action of said board. This proposition has been fully determined by our previous cases. See First National Bank of Montezuma v. Board of Review, 199 Iowa 1124; First National Bank of Newton v. Board of Review, 200 Iowa 131; Griswold Land & Credit Company v. County of Calhoun, 198 Iowa 1240; Lamont Savings

1254

Bank v. Luther, 200 Iowa 180; Dickey v. County of Polk, 58 Iowa 287. The assessments of the individuals about which complaint is made appeared upon the assessment rolls as "Moneys and Credits," while the assessments of the appellants appeared thereon as "Corporation Stock." No objection was made by the appellants to the Board of Review that they were assessed upon "Corporation Stock", while its alleged individual competitors were assessed upon "Moneys and Credits." Under the statutory law, the shares of the banks and "moneyed capital" should be assessed at the same rate. The assessments of the appellants and their stockholders was upon "corporation stock," and therefore, the tax to be computed thereon according to Section 1322-1a of the 1913 Supplement to the Code is the consolidated levy rate computed on 20% of the actual value of the stock, while the tax to be computed upon moneys and credits is the millage tax of 5 mills. The appellants knew, or could and should have known, of the claimed discrimination in this respect, and as to the alleged individual competitors, could properly have presented their complaint before the proper tribunal, to wit, the Board of Review, and taken an appeal therefrom. That was their exclusive remedy relative to the alleged discrimination which is the basis of their complaint as between them and the alleged moneyed capital claimed by them to have been loaned and invested by individuals in substantial amounts in competition with the business of banking. In Griswold Land & Credit Company of Manson v. County of Calhoun, 198 Iowa 1240, we made the following pronouncement:

"The rule to be deduced from the various provisions of the statute and the decisions of this court is that, unless the tax is illegal because levied without statutory authority, or levied upon property not subject to taxation, or by some officer or officers having no authority to levy the same, or is in some other similar respect illegal, the exclusive remedy of the taxpayer is to complain to the board of review, and, in the event that he is denied relief, then to appeal to the district court."

In First Nat. Bank of Montezuma v. Board of Review, 199 Iowa 1124, this proposition was raised before the board of review and appeal taken therefrom. We there said:

"Appellants contend that appellee could not raise the ques-

tions involved in this case by appeal from the board of review to the district court. No question of omitted property is involved, nor it is [is it] claimed there was an error in the valuation fixed on appellee's property; and the sole question is as to the correct amount of the tax and the manner of ascertaining the same. We have recently had occasion to review and pass upon the identical question raised by appellant as to whether appeal is a proper remedy in such a case, and collected and reviewed the authorities in Griswold Land & Credit Co. of Manson v. County of Calhoun, 198 Iowa 1240. On this point the instant case is controlled by our opinion in the cited case, which determined that, under the circumstances as shown in this record, *appeal is the proper remedy.*" (Writer's italics.)

In First Nat. Bank of Newton v. Board of Review, 200 Iowa 131, we declared:

"Appellant (the board of review) argues that the appeal from the board of review was not the proper remedy. This question is settled by Griswold Land & Credit Co. v. County of Calhoun, 198 Iowa 1240, and by First Nat. Bank of Montezuma v. Board of Review, 199 Iowa 1124."

In Lamont Sav. Bank v. Luther, 200 Iowa 180, we made the following pronouncement:

"The remedy by appeal is exclusive, and the failure of the person aggrieved by the assessment to appear before the board of review and make complaint waives his right to complain subsequently of any irregularity in the listing and assessment."

As to this proposition, we agree with the majority.

The foregoing authorities are *stare decisis* relative to the alleged discrimination in taxation as between the appellants and the alleged individual competitors, and as we proceed, no further consideration will be given to the contention of the appellants that alleged moneyed capital invested by the numerous individuals in notes, bonds, mortgages, and other securities constituted competing capital in one or more of the phases of the business of banking.

Another contention of the appellants' is that, during the years in question, there were various corporations engaged in business in the city of Des Moines, such as loan and investment com-

panies, etc.; that the capital employed in carrying on the business of these respective corporations was money; that the object of the business of said concerns was the making of profit by the use of its capital as money; that said corporations were engaged in the business of loaning money on the security of notes, bonds, and mortgages, and buying and selling securities, all involving elements of investment and reinvestment by them; that the shares of stock of said corporations constituted "moneyed capital" within the meaning of Section 5219 of the Revised Statutes of the United States; that the tax computed upon the shares of stock of said corporations was the millage tax of 5 mills on the dollar, while they (the appellants) were compelled to pay a tax at the consolidated levy rate of from 5 to 7 times the amount of their alleged competitors; and that thereby there has been worked an illegal discrimination as against them.

In January of each year, the appellants made to the city assessor of the city of Des Moines a verified statement, as required by Section 1322 of the 1913 Supplement to the Code. From this statement the assessor fixed the value of the shares of stock, based upon the capital, surplus, and undivided earnings of the banks. (There is no question herein involved relative to the assessments upon the real estate owned by the respective appellants.) Upon the assessment rolls, the assessor made one assessment in a lump sum upon all the shares of each bank and entered the same under the head "Corporation Stock." The assessment rolls were laid before the board of review and remained unchanged at the time of its adjournment.

In January of each year, the alleged competitive institutions also furnished the assessor a verified statement, as required by Section 1323 of the 1897 Code. Upon the assessment rolls, the assessor made one assessment in a lump sum upon all the shares of stock of said corporations, also under the head "Corporation Stock." These assessment rolls were laid before the board of review, and at the time of its adjournment remained unchanged. It will thus be observed that at the time of the adjournment of the board of review, the classifications of the assessments of the appellants and the alleged competitive institutions were identical —the assessments of all being upon "Corporation Stock." In compliance with the provisions of Section 1366 of the 1897 Code, the assessor proceeded to make up the assessor's books in duplicate

from the assessment rolls, and returned to the county auditor one of said books, together with the assessment rolls and the statements furnished him in connection with the assessments. The assessor's books were made in conformity with the assessment rolls. It will thus be observed that in the hands of the county auditor the assessments upon the appellant banks and the alleged competitive corporations were identical, all of the said assessments appearing upon the assessment rolls and the assessor's books under the heading "Corporation Stock." The assessment upon the shares of stock in the alleged competitive institutions was made by the assessor "*in kind,*" and so confirmed by the board of review.

In making up the tax list, the county auditor entered the assessments of the said alleged competitive institutions under the heading "moneys and credits, 5 M." In some instances, the assessments were originally placed by the county auditor upon the tax list under the heading "taxable value of personal," and by . him, or under his authority, the entry was thereafter scratched out and re-entered under the heading: "moneys and credits, 5 M." In this manner, all of the alleged competitive corporations for the various years paid a tax of 5 mills upon the value of its corporation stock, while the appellants, during said period, were compelled to pay a tax of from 5 to 7 times as much.

It is claimed by the appellants that in this manner an illegal discrimination has been worked against them and in favor of their competitors.

It is claimed by the appellees that this proposition should also have been raised by the appellants before the board of review, and by an appeal therefrom. This contention of the appellees cannot be sustained. The act which caused the discrimination was the act of the county auditor, which could not and did not occur until after the adjournment of the board of review. The appellants herein were powerless to raise anything before the board of review as to the assessment for any year which had not already occurred relative to the assessment for that year. See Munn v. Des Moines Nat. Bank, 18 Fed. (2d) 269. The *Munn* case was determined by the Circuit Court of Appeals on the 28th day of February, 1927. The appellees herein contend that they were unable, at that time, to cite Fort Madison Sec. Co. v. Maxwell, 202 Iowa 1346, which was determined by this court Feb-

ruary 8, 1927. Relying upon this latter case they now say in argument "that the act of the auditor in changing the classification of loan companies to moneys and credits was illegal," etc. We are unable to ascertain how an illegal act by the county auditor, made long after the adjournment of the board of review, could have been raised by the appellants when the board of review was in session. It is the appellants' contention that the act of the county auditor is what produced the illegal discrimination in favor of the alleged competing organizations and against them. It is quite clear that the appellants were powerless to present this proposition before the board of review.

The appellees also contend that mandamus is not the proper remedy. The holdings of this court are against this contention. See Steele v. Madison County, 198 Iowa 902; Murphy v. Berry, 200 Iowa 974; Home Sav. Bank v. Morris, 141 Iowa 560; Eyerly v. Jasper County, 72 Iowa 149; Beecher v. County of Clay, 52 Iowa 140; Dubuque & S. C. R. Co. v. Board of Supervisors, 40 Iowa 16; Fort Madison Sec. Co. v. Maxwell, 202 Iowa 1346; Farmers Ins. Co. v. Linn County, 202 Iowa 444; Commercial Nat. Bank of Council Bluffs v. Board of Supervisors, 168 Iowa 501. See, also, Section 1417 of the 1897 Code (now Section 7235, Code of 1927), which is the statutory authority under which the appellants bring this action. It provides:

"The board of supervisors shall direct the treasurer to refund to the taxpayer any tax or portion thereof found to have been erroneously or illegally exacted or paid, with all interest and costs actually paid thereon."

It must be borne in mind that under Section 5219 of the Revised Statutes of the United States, the taxation of national banks shall not be at a greater rate than upon other moneyed capital. If the shares of stock in the alleged competitive institutions are moneyed capital within the meaning of the law, then the action of the county auditor in changing the assessments of their stock from personal property,—from "corporate stock,"—to "moneys and credits" under the 5 mill statute, and leaving the appellants assessments on "corporate stock" at the consolidated levy rate, compels the appellants to pay at a greater rate than, and from 5 to 7 times as much as, the competitive institutions, and thereby makes the tax which the appellants were compelled to pay an

illegal tax—in contravention of the provisions of Section 5219 of the Revised Statutes of the United States; and when the appellants were compelled to pay said amount, it was illegally and erroneously exacted. In Commercial Nat. Bank of Council Bluffs v. Board of Supervisors, 168 Iowa 501, we declared:

"Such an order (to refund) is essential to repayment by the treasurer and to enter it, in a proper case, is the mandatory duty of the board of supervisors."

In Home Sav. Bank v. Morris, 141 Iowa 560, we find the following pronouncement:

"It seems to us that the statute (Section 1417 of the Code of 1897) itself fully answers the appellant's contention. It says in so many words just what shall be done. It says that the treasurer shall be directed to refund the tax illegally paid," etc.

In the recent case of Steele v. Madison County, 198 Iowa 902, an action at law was brought by a national bank to recover from the county taxes alleged to have been illegally exacted because of a violation of the restriction contained in Section 5219 of the Revised Statutes. We there said:

"* * * that if the board of supervisors refuses to do its duty and order a refund of the portion of the taxes erroneously or illegally exacted, an action in mandamus will lie. to compel such refund." (Citing numerous cases.)

Indeed, if the taxing authorities, through the action of the county auditor, so fixed matters that, in contravention of the provisions of Section 5219, Revised Statutes of the United States; an amount has been exacted in taxes upon the shares of stock of the national banks at a greater rate than upon the shares of stock of the alleged competitive institutions, and if they are not now entitled to a remedy in mandamus to put them on equality with the competitive institutions which have paid their taxes based on a lesser rate, the appellants would be remediless. See, as bearing on this proposition, Greene v. Louisville & I. R. Co., (U. S.) 61 L. Ed. 1280; Sioux City Bridge Co. v. Dakota County, (U. S.) 67 L. Ed. 340.

We are now confronted with the questions: Were the shares of stock in the various corporations engaged in business in the

city of Des Moines, and hereinbefore mentioned, moneyed capital within the meaning of Section 5219 of the Revised Statutes of the United States? And if so, was there a relatively material amount of such moneyed capital taxed at a lower rate than was applied to the shares of the appellants? In the determination of these questions, we must follow the decisions of the Supreme Court of the United States. That court is not concluded by the findings of a state court upon these questions. See First Nat. Bank of Hartford v. City of Hartford, (U. S.) 71 L. Ed. 767. Moneyed capital has been defined by the Supreme Court of the United States as follows:

"The terms of the Act of Congress, therefore, include shares of stock or other interests owned by individuals in all enterprises in which the capital employed in carrying on its business is money, where the object of the business is the making of profit by its use as money. The moneyed capital thus employed is invested for that purpose in securities by way of loan, discount, or otherwise, which are from time to time, according to the rules of the business, reduced again to money and reinvested. It includes money in the hands of individuals employed in a similar way, invested in loans, or in securities for the payment of money, either as an investment of a permanent character, or temporarily with a view to sale or repayment and reinvestment. In this way the moneyed capital in the hands of individuals is distinguished from what is known generally as personal property." Mercantile Nat. Bank v. Mayor (U. S.), 30 L. Ed. 895.

See, also, First Nat. Bank of Guthrie Center v. Anderson (U. S.), 70 L. Ed. 295; First Nat. Bank of Hartford v. City of Hartford (U. S.), 71 L. Ed. 767; Minnesota v. First Nat. Bank of St. Paul (U. S.), 71 L. Ed. 774; Merchants Nat. Bank of Richmond v. City of Richmond (U. S.), 65 L. Ed. 1135. In First Nat. Bank of Guthrie Center v. Anderson (U. S.), 70 L. Ed. 295, 303, it is aptly stated:

"The term 'other moneyed capital' in the restriction is not intended to include all moneyed capital not invested in national bank shares, but only that which is employed in such way as to bring it into substantial competition with the business of national banks. * * * Moneyed capital is brought into such competition where it is invested in shares of state banks or in private bank-

ing; and also where it is employed, substantially as in the loan and investment features of banking, in making investments, by way of loan, discount or otherwise, in notes, bonds or other securities with a view to sale or repayment and reinvestment. * * * The restriction is not intended to exact mathematical equality in the taxing of national bank shares and such other moneyed capital, nor to do more than require such practical equality as is reasonably attainable in view of the differing situations of such properties. *But every clear discrimination against national bank shares and in favor of a relatively material part of other moneyed capital employed in substantial competition with national banks is a violation of both the letter and spirit of the restriction.*" (Writer's italics).

In the recent case of First Nat. Bank of Hartford v. City of Hartford (U. S.), 71 L. Ed. 767, the Supreme Court of the United States made quite definite pronouncements upon the proposition now under consideration. It is there said:

"It is not denied, and indeed it affirmatively appears from the evidence, that there are individuals, firms and corporations in Wisconsin, not required by its laws to be incorporated as banks, engaged in the business of loaning money on the security of notes, bonds, and mortgages, and buying and selling securities, all involving investment and reinvestment by them and their customers. Through the activities of these business concerns, large investments are made and remade in such securities. Large amounts of capital are thus employed in some of the ordinary banking activities although these individuals and firms do not receive deposits. The state court did not ignore this evidence. It conceded that the local tax statutes were in fact discriminatory. But it apparently construed the decisions of this court as requiring equality in taxation only of moneyed capital invested in business substantially identical with the business carried on by national banks. Consequently, since that class of business must under the Wisconsin Statutes be carried on in corporate form and capital invested in it is taxed at the same rate as national bank shares, other moneyed capital, as defined in Sec. 5219, within the state, it thought, was not favored. Under this view, if logically pursued, capital invested in businesses engaged in some but not all of the activities of national banks as well as

that employed by individuals in investment and reinvestment in securities such as we have described could not be considered in determining the question of competition. But this court has recently had occasion, in reviewing the earlier decisions dealing with this subject, to point out that the requirement of approximate equality in taxation is not limited to investment of moneyed capital in shares of state banks or to competing capital employed in private banking. The restriction applies as well where the competition exists only with respect to particular features of the business of national banks or where moneyed capital 'is employed, substantially as in the loan and investment features of banking, in making investments by way of loan discount or otherwise, in notes, bonds or other securities, with a view to sale or repayment and reinvestment.' * * * Competition may exist between other moneyed capital and capital invested in national banks, serious in character and therefore well within the purpose of Sec. 5219, even though the competition be with some but not all phases of the business of national banks. Section 5219 is not directed merely at discriminatory taxation which favors a competing banking business. Competition in the sense intended arises not from the character of the business of those who compete but from the manner of the employment of the capital at their command. No decision of this court appears to have so qualified Sec. 5219 as to permit discrimination in taxation in favor of moneyed capital such as is here contended for. To so restrict the meaning and application of Sec. 5219 would defeat its purpose. It was intended to prevent the fostering of unequal competition with the business of national banks by the aid of discriminatory taxation in favor of capital invested by institutions or individuals engaged either in similar businesses or in particular operations or investments like those of national banks. Mercantile Nat. Bank v. New York, supra, * * * (30 L. Ed. 901, 7 Sup. Ct. Rep. 826). With the great increase in investments by individuals and the growth of concerns engaged in particular phases of banking shown by the evidence in this case and in Minnesota v. First Nat. Bank (273 U. S. 561, post, 774, 47 Sup. Ct. Rep. 468), discrimination with respect to capital thus used could readily be carried to a point where the business of national banks would be seriously curtailed. *Our conclusion is that Sec. 5219 is violated wherever capital, substantial in amount*

*when compared with the capitalization of national banks, is em-*
*ployed either in a business or by private investors in the same*
*sort of transactions as those in which national banks engage and*
*in the same locality in which they do business."* (The italics
are ours.)

In Commercial Nat. Bank of Miles City v. Custer County
(Mont.), 245 Pac. 259, the Supreme Court of the state made the
following pronouncement:

"We are of opinion that it was the intent and purpose of
Congress to exempt from the operation of the Federal Act in-
dividuals, co-partnerships, corporations, and associations whose
primary business is not that of banking, or whose business opera-
tions or investments may not be considered as normally common
to the banking business, and that neither individuals, corpora-
tions, co-partnerships, nor associations engaged in other activities
than banking are to be considered as engaged in the banking
business in competition with national banks simply because in
the conduct of their affairs they make occasional loans, either
secured or unsecured. In application of the law to the facts,
it is clear that the Miles Trust & Realty Company is not a state
bank; neither can it be classed as an individual or corporation
interested in private banking; nor is it engaged in operations
or investments common to the business of banking."

On December 5, 1927, said decision was by the Supreme
Court of the United States reversed by a memorandum opinion
on the authority of First Nat. Bank of Hartford v. City of Hart-
ford (U. S.), 71 L. Ed. 767, and Minnesota v. First Nat. Bank
(U. S.), 71 L. Ed. 774. See, also, Commercial Nat. Bank of
Miles City v. Custer (U. S.), 72 L. Ed. 395.

The evidence in these cases discloses that there are various
corporations in the city of Des Moines engaged in the business
of acquiring and selling notes, bonds, mortgages, and securities;
substantial capital is employed in their business; securities ac-
quired and offered for sale include public utility and other
forms of bonds, notes, and farm mortgages. These corporations
are heavily capitalized, and during the years in question did
a loan business mounting into millions of dollars. Each of said
corporations maintained offices for the transaction of their busi-
ness. It is shown by the record that it took several weeks in the

taking of the evidence in the trial court, and to set out the testimony *in extenso* would be of no benefit to the bench and bar. We will only refer to some of the testimony of an officer of one of said competing corporations. This corporation made farm loans and also city loans on property located in the city of Des Moines; dealt both in farm loan mortgages and in mortgages on residence and business properties in the city of Des Moines; sold loans after they were made to any purchaser that desired them; had a ground floor location in the main part of the business district of the city; generally dealt only in first mortgages and confined its loans not in excess of 50 per cent of the value of the property; during the period from 1919 to 1922, inclusive, it was continually engaged in investing and reinvesting its funds, either in mortgage loans or improvement certificates and bonds, selling securities, reducing the securities to money and again reinvesting it. It dealt in public improvement bonds and certificates. During the years in question, the mortgage loan business transacted by said company ran from two and one half to three million dollars per year. In connection with the loans made by it, it took interest-bearing notes, with definite maturity dates; in connection with the advancements made to public improvement contractors, notes were taken evidencing the advancements, which ran from 30 to 90 days and bore interest. The evidence with reference to this corporation is fairly typical of the evidence relative to the remaining competing corporations. While, as held in Welfare Loan Soc. v. City of Des Moines, 205 Iowa 1400, and Universal Loan Corp. v. Board of Review (Iowa), 219 N. W. 536 (not officially reported), the shares of stock of some of the corporations concerning which inquiry was made, cannot be held to be moneyed capital coming into competition with the business of national banks, yet the evidence is convincing, in fact, overwhelming, that the shares of stock in many of the corporations constitute moneyed capital within the meaning of the law, and that such moneyed capital was employed substantially as in the loan and investment features of banking in making investments by way of loans, discount or otherwise in notes, bonds or other securities, with a view to sale or repayment and reinvestment; and this is the test as laid down by the Supreme Court of the United States.

It is shown by the record that the capital of national banks

in the city of Des Moines during the years in question was about three million dollars, while that of state banks was from four and one half to six million dollars. The assessments upon the shares of stock found from the evidence to be competing institutions during said years varied from about one and one-half million in 1919 to an excess of five millions in 1922; and under the rule laid down by the italicized portion of First Nat. Bank of Hartford v. City of Hartford, supra, there has been a clear violation of Section 5219 of the Revised Statutes of the United States.

The action, hereinbefore mentioned, of the county auditor, was intentionally done. It applied to all of the assessments upon the shares of stock of the competing corporations. Therefore, within the meaning of the authorities from which quotations are hereinbefore given, to wit, Reagan v. Farmers L. & Tr. Co. (U. S.), 38 L. Ed. 1014; Sioux City Bridge Co. v. Dakota County (U. S.), 67 L. Ed. 340; Cummings v. Merchants Nat. Bank (U. S.), 25 L. Ed. 903; Raymond v. Chicago Union Trac. Co. (U. S.), 52 L. Ed. 78, and the other cases cited in connection therewith, an illegal discrimination has been worked against the appellant national banks and their shareholders by systematic, intentional, wrongful, and arbitrary administration of the law. In order for the appellant national banks to be entitled to relief, it is not a prerequisite that the action of the county auditor was done with intent to injure said banks. See Taylor v. L. & N. R. Co., 88 Fed. 350

One of the restrictive conditions provided for in Section 5219 of the Revised Statutes of the United States hereinbefore quoted for the taxation of the shares of national banks is "that the taxation shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state." The reasoning of the majority is that the assessment of the shares of stock of the appellant banks for each year involved was complete upon the adjournment of the board of review, and that the county auditor is no part of the taxing authority of the state. Therefore, they conclude that the taxation was complete without anything done by the county auditor. "Taxation" is defined by Webster's International Dictionary as:

"Act of laying a tax, or of imposing taxes, as on the sub-

jects of a state, by government, or on the members of a corporation or company by the proper authority; * * * a system of so raising revenue.''

The county auditor has an important duty to perform in taxation, ''the system of raising revenue,'' and in the collection of tax from the taxpayer. All that the assessor and the board of review could do under the statutory law was to fix the value of the shares of stock. The fixing of such value for the purposes of taxation, without anything further being done, does not constitute taxation; it constitutes only the initial step toward taxation. Without the county auditor's doing his duty in making up the tax list, not a cent of taxes could be collected. The clause in Section 5219 ''that the taxation shall not be at a greater rate than is assessed upon other moneyed capital'' means that the taxation upon shares of stock of national banks shall not be greater than on other moneyed capital, *taking into consideration both the rate of assessment and the valuation*. In other words, the aforesaid restriction contained in Section 5219 of the Revised Statutes of the United States has to do with the actual incidence and practical burden of the tax upon the taxpayer. See New York ex rel. Amoskeag Sav. Bank v. Purdy (U. S.), 58 L. Ed. 274, at 280; Boyer v. Boyer (U. S.), 28 L. Ed. 1089, at 1090; Des Moines Nat. Bank v. Fairweather (U. S.), 68 L. Ed. 191, at 196. In Boyer v. Boyer, supra, the Supreme Court of the United States declared:

''The court has had occasion to examine the provisions of the National Banking Act in several other cases recently determined. People v. Weaver, 100 U. S. 539 [XXV, 705]; Pelton v. Nat. Bk., 101 Id. 143 [XXV, 901]; Cummings v. Same, Id. 153 [XXV, 903]; Superrs. v. Stanley, 105 U. S. 305 [XXVI, 1044]; Evansville Bk. v. Britton, Id. 323 [XXVI, 1054]. From these cases may be deduced certain rules for the construction of that Act: 1. That the words 'at a greater rate than is *assessed upon other moneyed capital in the hands of individual citizens*' refer to the entire process of assessment, which, in the case of national bank shares, includes both their valuation and the rate of percentage on such valuation.''

The county auditor in making up the tax list applied to the valuation of the shares of stock of the competing institutions the

percentage of five mills on the dollar as for moneys and credits, and applied to the shares of stock of the appellant banks a different percentage, to wit, the consolidated levy rate upon 20 per cent of the value thereof as fixed by the assessor, and in this manner compelled the appellant banks to pay at the rate of from five to seven times as much in taxes as the competing institutions. Until the county treasurer has received the tax list, the preparation of which is the duty of the county auditor, there is no authority of law for the treasurer to demand or receive money in the payment of taxes.

The word "assessed" is frequently used as meaning to impose a tax. See People ex rel. N. Y. C. & H. R. Co. v. Priest (N. Y.), 62 N. E. 567. While the word "assess" as applied to the act of the assessor means "to make a valuation, or official estimate of, for the purpose of taxation," yet it also means "to determine and impose a tax or fine." See Webster's International Dictionary. For certain offenses, the court assesses,—that is, imposes,—a fine. It is thus apparent that the word "assessed" has several meanings, and while the shares of stock may have been assessed by the assessor for the purpose of taxation, the taxation is not then assessed,—not then complete,—only one step in the act of taxation having at that time been completed. The restrictive clause "that the taxation shall not be at a greater rate than is *assessed* upon other moneyed capital in the hands of individual citizens of such state," correctly construed, as we believe, is, "that the taxation shall not be at a greater rate than is [the taxation] assessed [imposed] upon other moneyed capital in the hands of individual citizens of such state."

The majority place great stress upon what they term the ministerial duty of the auditor, and that he erred only in the performance of a ministerial duty. We have held that in the assessment of shares of bank stock, the duties of the assessor are likewise ministerial. See First Nat. Bank of Remsen v. Hayes, 186 Iowa 892. When the assessor returned to the county auditor one of the assessor's books, together with the assessment rolls and the statements made in connection with the assessments, it was then the county auditor's next move, be the same clerical, ministerial, or otherwise, before any tax could be collected. Before the first

day of January in each year, the county auditor shall prepare the tax list and:

"He shall make an entry upon the tax list showing what it is, for what county and year, and deliver it to the county treasurer on or before the thirty-first day of December, taking his receipt therefor; *and such list shall be a sufficient authority for the treasurer to collect the taxes therein levied.*" (Writer's italics.) Section 7147, Code of 1927.

See, also, Section 7145, Code of 1927, and Sections 1383 and 1387, Code of 1897.

"The treasurer * * * shall proceed to collect the taxes, and the list shall be his authority and justification against any illegality in the proceedings prior to receiving the list; and he is also authorized and required to collect, as far as practicable, the taxes remaining unpaid on the tax books of previous years, * * *" Section 7184, Code of 1927 (Section 1390, Code of 1897).

It thus appears that, according to the statutes, the authority of the treasurer is to collect from the taxpayer the amount, whether right or wrong, as shown by the tax list prepared by the county auditor, and it is apparent that, under the aforesaid statutes, the auditor is a very important cog in the necessary machinery for the imposing and collection of taxes; for without the completion of the tax list and the certifying of the same to the county treasurer, there is no authority whatever for the county treasurer to collect any taxes.

The majority argue that there has been no discrimination as against the appellant banks, for the reason, as claimed by them, that the act of the county auditor in making up the tax list and applying to the competitive institutions a rate of 5 mills on the dollar as for moneys and credits was without authority, therefore wrongful and unlawful. It must be conceded that, if the county auditor had complied with the law, we would not be bothered with this litigation. It was nothing other than the unlawful act of the county auditor that has brought about the gross discrimination as against the appellant banks. The county auditor is one of the administrative officers of the state in the imposing and collection of taxes. It was the county auditor's wrongful administration of the law, as announced in Reagan v. Farmers L. & Tr. Co. (U. S.), 38 L. Ed. 1014, which produced the discrimination as against the

appellant banks. We again refer to Sioux City Bridge Co. v. Dakota County (U. S.), 67 L. Ed. 340, where the Supreme Court of the United States declared:

" 'The purpose of the equal protection clause of the 14th Amendment is to secure every person within the state's jurisdiction *against intentional and arbitrary discrimination*, whether occasioned by express terms of a statute *or by its improper execution through duly constituted agents*. And it must be regarded as settled that intentional, systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property.' " '(Writer's italics.)

The county auditor is *the duly constituted agent to prepare the tax list and certify same to the county treasurer. It was the improper execution of the duties of this duly constituted agent which resulted in the discrimination.* By reason of his manipulations, the stockholders of the appellant banks paid at a rate of from 5 to 7 times as much upon their shares of stock as was paid by the stockholders of the competing corporations upon their shares of stock. If this be not discrimination and in contravention of Section 5219 of the Revised Statutes of the United States, then what is it? According to Webster's International Dictionary, "discriminate" means "to make a difference or distinction." Certainly, as between the taxation of the shares of stock of the banks and the shares of the competing corporations imposed and collected, there has been a difference, a distinction, and therefore, discrimination. Was the action of the county auditor "intentional," "systematic," and "arbitrary?" "Intentional" is defined by Webster's International Dictionary, "done by intention or design; * * * as the act was intentional, not accidental." The making up of the tax list and entering the assessment of the competing institutions under the heading "Moneys and Credits, 5 M.," by the auditor, was no accident. He did exactly what he intended to do; it was intentionally done. It need not have been done with the intention on his part to injure the banks or their stockholders. See Taylor v. L. & N. R. Co., 88 Fed. 350. Was it systematic? The same dictionary defines "system" as "regular method or order," and "systematic" as "proceeding according to system or regular method." The action of the county auditor applied to *all* of the assessments upon the shares of stock of the

competing corporations: that was his system or regular method; therefore it was systematic. Was it arbitrary? The majority concede that the action of the county auditor was illegal and wrongful. The same dictionary defines "arbitrary" as "not governed by any fixed rules; * * * exercised according to * * * one's own will or caprice; * * * conveying a notion of a tendency to abuse the possession of power." It being conceded that the action of the auditor was illegal and wrongful, as is done by the majority, and that he had no power to do so, and when it is shown that his act was not accidental, but intentional, then it must necessarily follow that his action was arbitrary. It thus becomes apparent that there has been a gross discrimination as against the banks and their shareholders, and that the action of the county auditor was "intentional," "systematic," and "arbitrary."

While Section 7149 of the Code, 1927, provides that the auditor may correct any error in the assessment or tax list, and may assess and list for taxation any omitted property, the shares of stock of the competing corporations were assessed, and do not constitute omitted property; and we have held that the county auditor is without power to correct the tax list after the taxpayer has paid his taxes in accordance therewith. See In re Estate of Mead v. Story County, 119 Iowa 69; First National Bank of Remsen v. Hayes, 186 Iowa 892; Langhout v. First Nat. Bank of Remsen, 191 Iowa 957. Under Section 1374 of the Code of 1897 (now Section 7155, Code, 1927), the county treasurer may, at any time within 5 years from the date at which such assessment should have been made, proceed to subject to taxation property which has been withheld, overlooked, or from any other cause not listed and assessed. But the shares of stock of the competing corporations do not constitute omitted property, within the meaning of the law. It has been the universal holding of this court that unless the property is omitted property, then the treasurer is without power to proceed under the aforesaid section. See Woodbury County v. Talley, 153 Iowa 28; German Sav. Bank v. Trowbridge, 124 Iowa 514; Brainard v. Harlan, 158 Iowa 436; Security Sav. Bank v. Carroll, 128 Iowa 230; Langhout v. First Nat. Bank, 191 Iowa 957.

It is thus apparent that, the competing corporations having paid their taxes for the years in question, in accordance with the tax list furnished by the *duly constituted agent*, the county au-

ditor, there is no authority of law to collect any more tax for the years in question from the said corporations, and the result has been that gross discrimination has been practiced against the appellant banks by reason of the intentional, systematic, wrongful, and arbitrary administration of the law, through one of the administrative officers.

But the majority argue that, if the competing corporations have not paid the full amount of the tax which they should have paid, the deficiency has not been discharged, and the power of the state to compel payment does not end until payment is made, citing Weyerhaueser v. Minnesota (U. S.), 44 L. Ed. 583, and other cases. The majority do not clearly state what they have in mind in making the aforesaid assertion; but from a reading of the citations, it must be their view that the legislature may even yet enact retroactive legislation for the recovery of the amount of the tax which the competing corporations should have paid. Assuming, without conceding or deciding, that the legislature could enact such retroactive legislation which would be valid, suffice it to say that Section 5219, Revised Statutes of the United States, specifically states "that the taxation (of shares of national banks) shall not be at a greater rate than *is* assessed (imposed) upon other moneyed capital," etc. It is not stated in said section which gives permission to tax the shares of national banks, that the taxation shall not be at a greater rate than may be assessed upon other moneyed capital by a future legislative enactment or by a future legislative enactment with retroactive effect.

The present legislation of the state is in exact accord with the provisions of Section 5219, Revised Statutes of the United States. One of the administrative officers (*duly constituted agent for the collection of taxes*) is responsible for the illegal discrimination which has been worked against the banks. Under the law as it is written, the banks are not compelled to quietly rest in the hope that some legislature may, in the future, by retroactive legislation, fix it so that the competing corporations may still be liable for their delinquency, and that the administrative officers for the imposing and collection of taxes will then do their duty under said enactment (not done under the present law); and so act as to then bring about equality to which they are now entitled.

The minority cannot escape the conclusion that illegal discrimination has been worked against the appellant national banks

and their shareholders by systematic, intentional, wrongful, and arbitrary administration of the law.

The minority hold that the national banks are entitled to relief in this action, unless it be for affirmative defenses hereinafter considered. Are the state banks entitled to the same relief? We answer in the affirmative. See Section 2, Article 8, of the State Constitution; Section 6, Article 1, of the State Constitution; Security Sav. Bank v. Board of Review, 189 Iowa 463; Munn v. Des Moines Nat. Bank, 18 Fed. (2d.) 269; Commercial State Bank of Wagner v. Wilson (S. D.), 220 N. W. 152; State Bank of Omaha v. Endres (Neb.), 192 N. W. 322. It must be borne in mind that the appellants are not making any attack upon the constitutionality of our statutory law. Their pleadings, and the contention based thereon, are to the effect that the manner and method followed by the taxing officers in the administration of the statutory law constituted a violation of their statutory and constitutional rights. They are not complaining of any classification made by the legislative enactment. Their complaint is that the officers charged with the duty of administering the law intentionally, systematically, and habitually violated the terms of that law in its administration, so as to produce a gross discrimination in the rate of taxation imposed and collected as between property placed by the law in a certain class, and other property placed by the same law in the same class. In Munn v. Des Moines Nat. Bank, 18 Fed. (2d) 269, which was an action brought by one national bank and two state banks located in the city of Des Moines for injunctive relief from the same transactions herein involved, the court declared:

"The court below held that these excessive taxes were illegal and void because they were prohibited by the equal protection clause of the Fourteenth Amendment to the Constitution of the United States, by Section 5219 of the Revised Statutes (Section 9784, Comp. Stat.), which provides that the taxation by a state of the shares of national banking associations 'shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state,' by Section 6 of Article 1 of the Constitution of Iowa, which provides that, 'all laws of a general nature shall have a uniform operation,' by Section 2 of Article 8 of that Constitution, which provides that, 'the property of all corporations for pecuniary profit shall be subject to tax-

ation the same as that of individuals,' and by Sections 1310 and 1322-1a, Supplement to the Code of Iowa, 1913. These three suits were tried together and after the decrees were rendered were consolidated for record and hearing in this court. The nature of the cases and the issues contended and adjudged are practically identical. *The Constitution and statutes of Iowa protect the rights of the shareholders of the other two banks to the same extent as the rights of the shareholders of the Des Moines National Bank are protected by Section 5219 of the Revised Statutes and the Constitution of the United States.''* (Writer's italics.)

In Commercial State Bank of Wagner v. Wilson (S. D.), 220 N. W. 152, we have a case very similar to the instant cases. The lower court sustained a demurrer to the plaintiff's petition, and upon appeal, the lower court was reversed. It will be observed that in the cited case the plaintiff is a state bank. The court therein made the following pronouncement:

''The legislature, as a matter of fact, has put all banks, state and national, in the same classification for purposes of taxation. Laws of 1923, Chapter 103. State and national banks therefore being placed in the same classification, the constitutional provision that taxes shall be uniform on all property of the same class requires the application of the same rule to both state and national banks. Therefore, since, as we have seen, the shares of national banks cannot be taxed at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens, coming into direct competition with such banks, it follows that the shares of state banks in South Dakota cannot be taxed at a greater rate than is assessed upon other moneyed capital coming into competition with the business of such banks. * * * It is our view that the law providing for the taxation of moneys and credits is not unconstitutional and that if plaintiff can establish by competent proof that the shares of its capital stock are taxed at a greater rate than other moneyed capital, substantial in amount, coming into direct competition with its business in its locality, it will be entitled to recover the excess tax paid under protest.''

In Security Sav. Bank v. Board of Review, 189 Iowa 463, we held that the construction of the assessment statutes should be

such as to bring about uniformity in the taxation of national and state banks. We there said:

"If we were to adopt a construction herein, as to this plaintiff (a state bank), which, if applied to a national bank, would be violative of the Federal statute, Section 5219, we should thereby set a precedent which we could not follow, in the event that a national bank were the litigant. We should thereby destroy the very uniformity aimed at by the statute, as being essential to its operative power upon national banks. Therefore, though the plaintiff is not a national bank, it is entitled to insist upon a uniform construction of the statute, which shall be operative as against *all* banks. For this reason, we must, in construing our own statute, take account of the construction by the United States Supreme Court of the Federal statute."

Without further comment, the minority hold that the state banks are entitled to the same relief as the national banks.

The appellees assert that the appellants' causes of action are barred by the statute of limitations. This contention is devoid of merit. The actions were brought within five years from the date of payment of the taxes. The period of the statute of limitations is five years, and the action accrues at the time of the payment of the tax. See Section 11007, Paragraph 5, of the Code; Callanan v. County of Madison, 45 Iowa 561; Beecher v. County of Clay, 52 Iowa 140; Murphy v. Board of Supervisors, 205 Iowa 256.

The appellees plead, as affirmative defenses, former adjudication, laches, and estoppel. It appears that in 1919, the appellants, along with the Des Moines National Bank, took appeals from the action of the board of review in making the assessments for that year. Said appeals involved only the claimed right of the bank to deduct the par value of Liberty bonds held by them in fixing the value of their shares of stock. The defendants in said cases filed demurrers, which were overruled, whereupon notice of appeal was given by all of the complaining banks. The Des Moines National Bank perfected its appeal, which was heard in this court, and affirmed, and is found reported in 191 Iowa 1240. The case was carried to the Supreme Court of the United States, and was there affirmed, and is found reported in (U. S.) 68 L. Ed. 191. A stipulation was entered into by the attorneys of the respective parties in the instant cases, that said causes should

abide the final judgment of the Supreme Court of Iowa, or the Supreme Court of the United States. No further action was taken in said cases. It will be observed that the matter involved in the instant cases was not involved in the former litigation. As we have hereinbefore stated, the act which brought about the illegal discrimination was the act of the county auditor, which occurred long after the time of the adjournment of the board of review. The matter now in litigation, in so far as the competing corporations are concerned, was not involved, and could not have been raised by the appellants in the former litigation. After the board of review adjourned, its duties were completed. The causes of action of the appellants involved in this appeal, and the causes of action involved in the former appeal from the board of review, are not identical, and therefore appellees' plea of former adjudication must fail. See Ashman v. City of Des Moines, 209 Iowa 1247; Munn v. Des Moines Nat. Bank, 18 Fed. (2d) 269.

It also appears that before the decision of the Supreme Court of the United States, appeals were taken from the action of the board of review in subsequent years, raising the same proposition as was involved in the Des Moines National Bank case. These cases were not brought to trial, and after the decision by the United States Supreme Court of the Des Moines Nat. Bank case, they were dismissed. It also appears that the Iowa National Bank and the Central State Bank commenced suits in equity in the United States District Court for the southern district of Iowa to enjoin collection of the taxes in question. These latter cases were not brought to trial in the Federal court, and were voluntarily dismissed. It is a well recognized rule that the voluntary dismissal of a suit is without prejudice and cannot constitute an adjudication.

The actions by the appellants herein were all brought within the period prescribed by the statute of limitations, and the record fails to reveal any act of commission or omission by the appellants upon which the appellees had a right to rely, and upon which they did rely to their prejudice. Therefore, their pleas of laches and estoppel must also fail. See Munn v. Des Moines Nat. Bank, 18 Fed. (2d) 269.

Another contention of the appellees' is that the banks are not the proper parties plaintiff, or that there is a defect of par-

ties, because the shareholders are not joined. This contention of the appellees' is also devoid of merit. See Section 1325 of the Code of 1897; Kennedy v. Citizens Nat. Bank, 128 Iowa 561; Fourth Nat. Bank v. City of Boston, 300 Fed. 29; First Nat. Bank v. Achenbach (Okla.) 237 Pac. 574; McFarland v. Central Nat. Bank, 26 Fed. (2d) 890; Hannan v. First Nat. Bank, 269 Fed. 527; First Nat. Bank v. Eddy (S. D.), 198 N. W. 554; National Bank of Commerce v. City of New Bedford (Mass.), 29 N. E. 532, 534; State Nat. Bank v. City of Memphis (Tenn.), 94 S. W. 606; Home Sav. Bank v. Morris, 141 Iowa 560; Fort Madison Sec. Co. v. Maxwell, 202 Iowa 1346; Cummings v. Merchants Nat. Bank (U. S.), 25 L. Ed. 903.

The evidence shows, without dispute, that the banks actually paid the taxes out of their own funds, and no recoupment has been made from the shareholders,—no dividend has been declared out of which the taxes were paid.

Section 1325 of the Code of 1897 provides, in substance, that the bank shall be liable for the payment of the taxes assessed to the stockholders of such corporation.

In Kennedy v. Citizens Nat. Bank, 128 Iowa 561, the plaintiff, a stockholder, brought action against the bank to recover an alleged dividend due the stockholder. The bank had paid the taxes from its own funds, but made no allowance therefor in the payment of dividends. The plaintiff brought suit on the theory that the payment of the tax constituted a declaration of a dividend. This court in the determination of the case made the following pronouncement:

"The defendant bank, as was its duty, paid the taxes levied against the shares of stock from 1892 to 1898, inclusive, but neglected to retain the respective amounts from the dividends subsequently declared, or to enforce the lien thereof against the stock, as permitted by statute. See Section 819, Code 1873 (Section 1325, Code 1897). * * * The taxes were paid by the bank, as agent of the stockholders, in pursuance of statutes so requiring; and under the Code of 1873, it had the right 'to retain so much of any dividend belonging to any shareholder as shall be necessary to pay any taxes levied upon his shares;' and under the Code 'the corporation may recover from each stockholder his proportion of the taxes so paid, and shall have a lien on his stock and unpaid dividends therefor. If unpaid dividends are not sufficient

to pay such tax, the corporation may enforce such lien on the stock by public sale of the same,' etc. These claims for the repayment of the taxes, then, were assets of the bank. It had the right to collect them the same as any other indebtedness owing it, and from its omission or neglect to do so no liability in favor of any individual stockholder arose. As said, the debt belonged to the bank, and not to him, and under all the authorities he may not maintain an action thereon for his own benefit.''

In McFarland v. Central Nat. Bank of Topeka, 26 Fed. (2d) 890, a demurrer to the petition on the ground that the bank could not maintain the action because the stockholders were necessary parties and the only proper parties plaintiff was overruled, the court declaring:

''The pleadings of the bank clearly alleged these facts which have been stated and others. The defendants demurred to these pleadings, the court below overruled their demurrer, and their counsel contends that there was error in this ruling, because the bank was not the real party in interest in this action and its shareholders were. But these defendants in this case are in no position to invoke the protection of the statute, which requires actions to be brought by the real party in interest, because the prosecution by the bank of this action and its recovery from the defendants of this $12,477.26, which the bank paid to them, will protect them from any future suits or claims to that fund by any other party. The purpose of the statute is not to allow defendants to demand the adjudication of equities which exist wholly between the plaintiff and third persons, and that purpose is fully attained, so far as the defendants are concerned, if, in the action as brought, the defendants are not shut out from their proper defenses and counterclaims, and will be fully protected by the judgment, whether for or against the plaintiff, in the event of any other claim on the same cause. * * * The defendants cannot be heard to maintain this dog in the manger defense. Nor, if it were heard, could the defendants sustain it. Section 79-1101 of the Revised Statutes of Kansas provided that the president, cashier, or other managing officer of this bank should furnish the assessing officer during the month of March in each year a list of all its shareholders and of the numbers of shares owned by each shareholder, and a statement under oath correctly showing the amounts of capital stock, surplus and undivided profits of the

bank as of March 1st of each year, and that it 'shall pay the tax assessed upon the shares of stock and shall have a lien thereon until the same is satisfied: Provided, that if for any reason the taxes levied upon the shares of stock shall not be paid by the institution, the property of the individual shareholders shall be held liable therefor.' * * * To prevent the seizure and sale of the property of the shareholders in payment of these illegal taxes until after a judicial decision of the question of their legality could be procured, the bank paid this $12,477.26 to the defendants. The shareholders did not pay it; there is no evidence that they have ever reimbursed the bank for its payment. The defendants received this money and still have it. They have no legal or equitable right to it, or interest in it, and in law and equity they ought to pay it back to the bank, and we are of the opinion that the bank is the real party in interest in this action, and can maintain its action for it, and recover it from the defendants. Cummings v. National Bank, 101 U. S. 153, 156, 25 L. Ed. 903; Hannan v. First Nat. Bank (C. C. A.) 269 F. 527, 530; First Nat. Bank v. City of Hartford, 273 U. S. 548, 47 S. Ct. 462, 71 L. Ed. 767; Ranchmen's Trust Co. v. Duncan, 114 Kan. 308, 310, 219 P. 523.''

In Fourth Nat. Bank v. City of Boston, 300 Fed. 29, we find the following pronouncement:

''* * * it seems to be conceded that an action may properly be brought by the bank as the statutory taxpaying representative of the shareholders * * *.'' (Citing numerous cases.)

In Hannan v. First Nat. Bank of Council Bluffs, 269 Fed. 527, it was held that since the bank is made liable for the payment of the taxes assessed to its stockholders, a pecuniary liability is imposed on the bank for the payment of the total amount of the tax imposed on all its stockholders, and that it (the bank) is the real party in interest in a suit brought to enjoin the collection of the taxes.

In Cummings v. Merchants Nat. Bank (U. S.), 25 L. Ed. 903, it was contended that a national bank could not, as plaintiff, bring an action in equity to enjoin the collection of taxes upon its shares of stock levied in violation of Section 5219 of the Revised Statutes. The court in disposing of this contention said:

''In paying the money it is acting in a fiduciary capacity as

the agent of the stockholders; an agency created by the statute of the state. If it pays an unlawful tax assessed against its stockholders, they may resist the right of the bank to collect it from them. The bank, as a corporation, is not liable for the tax, and occupies the position of stakeholder, on whom the cost and trouble of the litigation should not fall. If it pays, it may be subjected to a separate suit by each shareholder. If it refuses, it must either withhold dividends and subject itself to litigation by doing so, or refuse to obey the laws, and subject itself to suit by the state. It holds a trust relation which authorizes a court of equity to see that it is protected in the exercise of the duties appertaining to it.''

Other quotations of a similar nature could be made from the foregoing authorities, but we deem it unnecessary. As hereinbefore stated, the banks paid the taxes out of their funds, and no dividends have been declared out of which these taxes were paid. It is quite clear that the claims for a refund are assets belonging to the banks, and that they are the proper plaintiffs in these causes of action. We are not, at this time, concerned about any future adjustments as among the banks and their respective stockholders.

Some of the appellants, at the time of the making of the payments of the taxes, did so under specific written protest, and the tax receipts show that said payments were so made; others paid under protest and the tax receipts contained the statements ''paid under protest.'' In two or three instances, a payment of taxes was made during the years in question, without a showing that the same was made under protest. The question at this point is: In order for a recovery of the taxes illegally and erroneously exacted and paid, must the payment have been made under protest? We answer said question in the negative. See Section 1417 of the Code, 1897 (now Section 7235 of the 1927 Code). Also, see Commercial Nat. Bank of Council Bluffs v. Board of Supervisors, 168 Iowa 501; Slimmer v. Chickasaw County, 140 Iowa 448; Lauman v. County of Des Moines, 29 Iowa 310; Richards v. Wapello County, 48 Iowa 507; Dickey v. County of Polk, 58 Iowa 287. It is a well recognized rule of the common law that, except as otherwise provided by statute, a person cannot recover for money which has been voluntarily paid upon a demand made against him. See 48 Corpus Juris 734 *et seq.* The appellants base

their right of action upon Section 1417 of the 1897 Code, which has been hereinbefore quoted. Therefore, appellants' actions are founded upon a statutory right. We have hereinbefore shown that the action of the county auditor made an illegal discrimination as between the appellants and the competing organizations; that, because of the intentional, systematic, and habitual administration of the law, the tax exacted from the appellants upon their shares of stock, in excess of that demanded from the competing institutions upon their shares of stock, was unconstitutional, illegal, and erroneous. This being true, the appellants are within their legal statutory rights in demanding the amount of taxes so illegally and erroneously exacted. In Slimmer v. Chickasaw County, 140 Iowa 448, this court made the following pronouncement:

"The action is bottomed upon Section 1417 of the Code, which, so far as material, reads as follows: * * * [Here follows the quoted section of the Code]. Under this section it has been held in many cases that a taxpayer may by action recover back taxes erroneously or illegally exacted or paid, even though paid voluntarily and without protest. * * * [Citing cases.] At common law, no such action would lie, for the reason that taxes voluntarily paid, although erroneous or illegal, could not be recovered back."

In Commercial Nat. Bank of Council Bluffs v. Board of Supervisors, 168 Iowa 501, we declared:

"The taxes were voluntarily paid as contended, but this furnishes no objection to refunding under this statute." (Referring to Section 1417 of the 1897 Code.)

The appellees argue that the appellants have not come into court "with clean hands." We find nothing in the record of any conduct on their part, in connection with the matter in litigation, which is unconscionable, or such as to bar them from their legal and equitable rights.

The majority declare, in substance, that the action of the auditor in making up the tax list relative to the competing corporations was a nullity. We have shown that the tax list furnished by the auditor was not a nullity, for it was the authority for the treasurer to collect the amount therein stated. It is contended by the appellees, in substance, that the appellant banks

are not entitled to relief, because they did not take action to have the taxes of the competing corporations corrected and raised to the same level as that paid by the banks. Relief for the banks by the course of action suggested by the appellees would be improbable, if indeed not impossible. It would result in a multiplicity of suits, and would require each stockholder of a bank to constitute himself one of a vigilance committee to act for and in behalf of the public, in order to obtain justice for himself and equal protection for himself with others under the law. As bearing upon this proposition, see Greene v. Louisville & N. R. Co. (U. S.), 61 L. Ed. 1291; Sioux City Bridge Co. v. Dakota County (U. S.), 67 L. Ed. 340. The appellant banks have the legal right to maintain the actions which they are pursuing, in order to place them on equality with their competitors, and were not required to take the course of action suggested, even could such litigation have been successful, a proposition which it is unnecessary to determine. As hereinbefore stated in Munn v. Des Moines Nat. Bank, 18 Fed. (2d) 269, one national bank and two state banks located in the city of Des Moines obtained injunctive relief from the same transactions herein involved. In Dickey v. County of Polk, 58 Iowa 287, the taxpayer sought relief under the same statute invoked by the appellant banks. The tax paid was illegal, because of the action of the board of supervisors in raising the tax without authority of law, and we held that the taxpayer was entitled to the relief demanded, saying:

*"The obvious purpose of Code Section 870 [Section 1417 of the Code, 1897, now Section 7235 of the Code, 1927], is to give a remedy by action to recover for taxes paid which the taxpayer could not have been compelled to pay.* \* \* \* It is sufficient for us to know that the tax in question, \* \* \* is unlawful; that its collection could not have been lawfully enforced against plaintiff; that it was therefore 'erroneously and illegally exacted and paid;' and that in such cases the law provides for an action by the taxpayer to recover the amount he has been unlawfully required to pay.'' (Writer's italics.)

In the cited case, the illegality consisted in the action of the board of supervisors beyond their powers, while in the instant cases, the illegality consisted in the action of the county auditor. While, if the appellant banks had sought injunctive relief as was done by the plaintiffs in the *Munn* case, they would have been

successful, and would not have been compelled to pay the excess tax, yet Dickey v. County of Polk, supra, and the other cases hereinbefore cited, together with the statutory provision Section 7235 of the Code are sufficient authority in justification of the present action brought by the appellant banks.

The record fails to reveal any connivance by the appellant banks or their stockholders with the county auditor. It was the officer who committed the wrong, and the same was committed against the appellant banks. The banks did not solicit the auditor's course of action, nor join with him in a conspiracy or any other illegal act to perpetrate the wrong. The appellant banks are only seeking that equality accorded to them by the Constitution and the statutory law.

One remaining proposition demands our consideration. On November 28, 1923, which was shortly after the decision by the Supreme Court of the United States in Des Moines Nat. Bank v. Fairweather (U. S.), 68 L. Ed. 191, the appellants Iowa National Bank, Central State Bank, and Des Moines Savings Bank tendered to the county treasurer, in payment of the taxes for the years in question, a sum computed at the rate of 5 mills upon the assessed valuation of its shares of stock for the respective years, and 6 per cent interest upon said sums from the 30th day of March of the year in which the tax was payable, which tender was refused by the county treasurer; and said appellants then paid, under specific written protest, the entire amount of said taxes computed under the consolidated levy rate and statutory penalties thereon. As hereinbefore stated, the appeal in the Des Moines Nat. Bank case involved only the claimed right of the bank to deduct the par value of Liberty bonds in fixing the value of the shares of stock, and a stipulation was entered into that the appeal in said case should be decisive of the similar proposition involved in the appeals taken by the other banks. It will be noted that no such stipulation was entered into relative to the appeals taken by the banks in the years subsequent to 1919.

It is our view that any penalty exacted upon any portion of the taxes which might be found to be illegal and erroneous can be recovered, as well as the tax itself; but it is the contention of the aforesaid banks that, because of their good-faith appeals, the taxes were not delinquent until the determination of the Des Moines Sav. Bank case by the Supreme Court of the United

States, and that no penalty could be legally exacted by the county treasurer, and that the amount of their tender hereinbefore mentioned is all that the county treasurer was legally entitled to. It must be borne in mind that the appellants entirely failed in their contentions asserted in the litigation then pending, as shown by the decision in the Des Moines Nat. Bank case. The question thus presented is: Do statutory penalties accrue while a good-faith appeal is pending from the board of review to determine the amount of an assessment for taxation purposes? These appellants frankly admit that this question has not heretofore been passed upon by this court. In support of their contention, they rely upon Rystad v. Buena Vista County Drain. Dist., 170 Iowa 178, and Barber Asph. Pav. Co. v. District Court, 181 Iowa 1265. The Rystad case involved an assessment imposed upon real estate for drainage purposes, and the Barber Asph. Pav. Co. case involved an assessment upon real estate for paving. The minority are not disposed to apply the principle announced in said cases to a case involving general taxes, and especially where, as here, the appellants' position in the appeal was not sustained. Section 1403 of the 1897 Code specifically provides that the taxes in question become delinquent the first day of March after due, and Section 1413 of said Code specifically provides what penalty shall be paid upon the taxes remaining unpaid on the first day of April. The provisions of said sections are mandatory—"*shall* become delinquent." "The whole *shall* become due and draw interest as a penalty," etc. It is the conclusion of the minority that, if the provisions of the statutory law should not apply to a case where an appeal has been taken from the action of the board of review, the remedy lies in legislative enactment, and not in judicial construction. As we understand the majority opinion, there is no divergence of views between the majority and minority as to this proposition.

The minority have considered every proposition urged by the respective parties. It is our conclusion that, under the mandates of the law and under the facts, the taxation of the shares of stock of the appellants cannot be at a greater rate than the taxation upon other "moneyed capital;" that, since we cannot increase the taxes upon the other "moneyed capital,"—the shares of stock of the competing corporations (see Sioux City Bridge Co. v. Dakota County [U. S.], 67 L. Ed. 340), the appellants should be and are entitled to a writ of mandamus, ordering the board of

supervisors to direct the county treasurer to refund to the appellants all amounts which have been paid in excess of an amount computed at 5 mills on the dollar of the valuation of their shares of stock, as shown by the assessment rolls and the assessor's books, and all penalties which have been paid, except upon the amount which would be due from the appellants, as thus computed.

Because of our views herein expressed, we disagree with the majority opinion filed herein. We would reverse.

ALBERT, KINDIG, and GRIMM, JJ., join and concur in this dissenting opinion.